IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| AARON JASON LAROSE, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) |
| DAVID VANDERGRIFF, | ) No. 4:21-cv-00928-JMD ) |
| *Defendant*. | ) ) ) ) |

## MEMORANDUM AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

A jury found Aaron LaRose guilty of first-degree murder and armed criminal action after he strangled and stabbed his wife, Jill LaRose, killing her. The state court sentenced him to life without parole for the murder plus 30 years for the armed criminal action. He filed this action for habeas relief under 28 U.S.C. § 2254.

This case highlights why courts, in reviewing habeas petitions, often should focus first on whether the petitioner is factually guilty, not whether he has satisfied the technical requirements under the habeas statute. Focusing on the question of factual guilt can hasten resolution. LaRose's petition is nearly 450 pages and includes 86 claims, many of which have several subparts. But LaRose provides no reason to doubt that he is guilty. LaRose repeatedly threatened Jill that he would "hurt her" if she did not do what he said. He repeatedly harassed her, calling her more than 400 times the week she was murdered. Jill was murdered just after leaving a divorce proceeding that she attended with LaRose. And police found (1) LaRose's DNA on a murder weapon, (2) Jill's blood on LaRose's shoe, and (3) keys to Jill's car at LaRose's house after the murder.

1

LaRose's factual guilt dooms his habeas petition, regardless of whether he could prevail on any of his 86 claims. As the Supreme Court has repeatedly held, satisfying the statutory requirements for habeas is never enough. A petitioner seeking habeas relief must also convince a court to award relief as a matter of equitable discretion. "'Even a petitioner who prevails under AEDPA must still today persuade a federal habeas court that law and justice require relief.'" *Hurst v. Adams*, No. 4-24-cv-01666-JMD, 2025 WL 3718303, at *1 (E.D. Mo. Dec. 23, 2025) (quoting *Brown v. Davenport*, 596 U.S. 118, 134 (2022) (cleaned up)). "'Today, then, a federal court *must deny* relief to a state habeas petitioner who fails to satisfy either the Supreme Court's equitable precedents or AEDPA.'" *Id.* (quoting *Davenport*, 596 U.S. at 134) (cleaned up).

The Supreme Court's equitable precedents make clear that a guilty petitioner like LaRose cannot receive habeas relief, even if every one of his statutory arguments were to succeed. Before granting habeas relief, a court must act "'in accordance with equitable and prudential considerations.'" *Id.* (quoting *Davenport*, 596 U.S. at 132). "'Foremost among those [equitable] considerations is the States' powerful and legitimate interest in punishing the guilty.'" *Id.* at *4 (quoting *Davenport*, 596 U.S. at 132). Federal courts must also bear in mind that a "person 'who comes into equity must come with clean hands.'" *Id.* at *5 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). And "a guilty inmate does not come to a court with clean hands." *Id.* So courts "generally are prohibited from" granting habeas to a prisoner—like LaRose—who is "factually guilty." *Id.* at *1, 5 (noting "limited exceptions" to this rule, such as a person being convicted of violating "a patently unconstitutional law").

LaRose asserts his innocence but provides no colorable theory of actual innocence based on the record before the Court. So he cannot establish that his is the "truly

2

extraordinary" case where the prisoner is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citation omitted). LaRose's petition instead joins the "flood of worthless ones" that "inundate the docket of the lower courts" and divert judicial attention. *Brown v. Allen*, 344 U.S. 443, 536–37 (1953) (Jackson, J., concurring). Instead of assessing each of LaRose's 86 counts one by one, the Court concludes that his factual guilt means he cannot satisfy the equity requirements for habeas relief. Because federal courts can almost never exercise their "equitable discretion" to release a state habeas petitioner who is factually guilty, *Davenport*, 596 U.S. at 132, LaRose's petition is denied.

## Background

Jill LaRose's body was found in a ditch. She had been strangled by a rope and dragged down a gravel road on her back before bleeding to death from three stab wounds to her neck—one of which "completely transected and cut across [her] carotid artery and [] jugular vein." ECF 18-7 at 11.

Jill was murdered while trying to divorce LaRose. During their marriage, he "controll[ed] what she did, what she wore, where she went." ECF 18-2 at 67. Jill separated from him in late 2007, but LaRose continued his behavior. He would appear unannounced at her home and would call her "at least once every other hour." ECF 18-5 at 120, 126. LaRose would ask their children to keep tabs on Jill, to report "what [Jill] was doing," whether "she was wearing anything she shouldn't be wearing," and "[w]ho had been over at the house." ECF 18-5 at 125, 128.

After Jill filed for divorce in August 2008, LaRose kept harassing her. One daughter overheard "a lot" of phone conversations where LaRose told Jill that he "would just hurt her" and saw texts he sent threatening to "hurt her if she didn't do what he said." ECF 18-5 at 127–28. He apparently tried to place a GPS tracking device in Jill's car. He researched cell

3

phone monitoring software to access Jill's calls and messages covertly.  On one single day, he called Jill 168 times.  The week Jill was murdered, LaRose called her over 400 times.

In 2009, on the day Jill was murdered, the two had a divorce-related court appearance.  Jill went alone because she "wanted to prove that she was strong enough to stand up to him herself."  ECF 18-2 at 39–40.  LaRose called her six times before 7:00 a.m.  Before the proceeding started, he found Jill, who was parked in a nearby lot, and pulled up directly next to her; Jill drove away "scared" and "frantic."  *Id.* at 41–42.  Once inside the courthouse, LaRose "kept trying to sit next to" Jill and "make eye contact with her"—only relenting after Jill's lawyer assigned two interns to sit with her to keep him away.  ECF 18-2 at 50, 136.

LaRose left the proceeding at 1:03 p.m., five minutes before Jill, and they both headed for the parking garage.  At about 1:20 p.m., Jill called her stepsister from her car.  That call ended abruptly with Jill gasping and the sound of many phone buttons being pushed.  It was the last call Jill ever made.

Police found Jill's body that evening in a roadside ditch.  Her head was submerged in water.  From the scene, they recovered (1) two pieces of rope consistent with the strangulation marks on Jill's neck; (2) shoeprints consistent with LaRose's shoes in tread, shape, and size; (3) two pieces of Wrigley's Spearmint gum, which LaRose "always" chewed, ECF 18-2 at 67; and (4) several bluish-gray buttons similar to ones on the shirt LaRose wore that day.  Around the same time, they discovered her car—abandoned—two blocks from the courthouse.  The car had Jill's blood on it, but there were no keys.  Police later found "the keys themselves" to the car "sitting on top of [the] dresser" in LaRose's bedroom.  ECF 18-4 at 104; *see* ECF 18-7 at 21.

4

Meanwhile, LaRose had almost two unaccounted-for hours between leaving the courthouse and returning home around 4:00 p.m.[1] He was no longer in the clothes he wore to court. He went to the bathroom, to the garage, and then back to the bathroom, where he stayed for a long time. His daughter thought the bathroom smelled like chlorine, and he said it was bleach.[2] LaRose next went to a nearby Walmart to make a purchase at 4:46 p.m. before apparently arriving at a JC Penney's store at 5:13 p.m. There, he purchased a blue shirt, black pants, and a tie—almost directly matching the clothes he wore to court (except his original shirt did not appear to have white buttons, and his new one did).[3] He returned home, and his daughter told him Jill was missing. Despite his many well-documented attempts to keep tabs on Jill's location and activities, LaRose simply said "oh" as he walked into his room. ECF 18-5 at 76.

Evidence from Jill's murder, including DNA testing, implicated LaRose. In addition to footprint analysis finding consistencies between LaRose's shoes and the shoeprints from the scene, investigators confirmed Jill's DNA in two places on LaRose's shoe. DNA analysis

---

[1] LaRose asked his daughter what time he got home. When she told him 4:00 p.m., he said that she was wrong: it had been 3:50 p.m. In an interview with police, he again provided an incorrect timeline: he said he left court between 12:30 p.m. and 12:40 p.m., but surveillance video showed him leaving more than 20 minutes later and only five minutes before Jill left.

[2] LaRose said he was cleaning the toilet with bleach, but it did not look like the toilet had been cleaned. The bleach was usually kept downstairs, not in the bathroom.

[3] When police arrived at LaRose's home that night to interview him, they asked to see the clothes he wore to court. He handed them a shirt that "look[ed] like it ha[d] just been pulled out of the bag because it ha[d] the exact creases from the way that [JC Penney] fold[s] [its] dress shirts for presentation." ECF 18-4 at 31. The shirt smelled new, lacking even the "slightest" smell of body odor despite Aaron supposedly wearing it on a day where the temperature reached nearly 100 degrees, ECF 18-2 at 199; ECF 18-14 at 18 (LaRose's appeal brief for post-conviction relief) (admitting that "it did not appear that [his blue shirt] had been worn"). His pants also appeared to be new, and LaRose could not find the tie he had worn that day. ECF 18-14 at 20 (admitting that the pants "had one pocket unbuttoned, which was also consistent with the way that JC Penney put them on the shelves"). His shoes looked like they had been recently wiped.

5

on the first piece of rope revealed not only Jill's blood, but also both Jill's and LaRose's DNA. Similar testing on the second piece of rope showed LaRose's blood in a blood stain pattern consistent with a broken blister on his hand that was popped. He also had a "light linear mark" on his hand. ECF 18-3 at 125. Finally, Jill's blood was on one of the loose bluish-gray shirt buttons police discovered at the scene of the crime.

A jury convicted Aaron LaRose of first-degree murder and armed criminal action. The trial court sentenced him to consecutive terms of life without parole for murder and 30 years for armed criminal action. The Missouri Court of Appeals affirmed his convictions and sentences on direct appeal. *State v. LaRose*, 412 S.W.3d 294 (Mo. App. E.D. 2013). LaRose then turned to collateral relief. After an evidentiary hearing, the post-conviction review court rejected LaRose's arguments. The Missouri Court of Appeals similarly rejected LaRose's arguments on appeal.

LaRose now raises (at least) 86 claims in his nearly 450-page petition,[4] which includes unnumbered additional arguments and scattered subparts. Among these claims, LaRose contends that he is "innocent," alleging that his conviction therefore violated his rights under the Fifth, Sixth, Eighth, and Fourteenth amendments. ECF 1 at 14.

## Analysis

Habeas has always been discretionary, requiring courts to assess the statutory factors of § 2254 as well as equitable factors. *E.g.*, *Davenport*, 596 U.S. at 127–134; *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022); *Hurst*, 2025 WL 3718303, at *3. "[B]ecause factual guilt is nearly always an insurmountable barrier to habeas relief and because nothing in the record

---

[4] LaRose filed similar *pro se* briefing in Missouri state court that exceeded 800 pages. He states he raised "over 300 claims" in that motion. ECF 1 at 404.

remotely suggests factual innocence," LaRose's petition "plainly fails" as a matter of equity. *Hurst*, 2025 WL 3718303, at *4.

### I.

Based on the available record, there is no colorable doubt that LaRose is guilty. LaRose argues that he "was no where around the crime scene" and challenges the DNA evidence against him.[5]  ECF 1 at 20.  But LaRose's arguments lack merit.

First, he contends that videos from two stores conflict with the police's timeline. These videos were "grainy, fuzzy, and not very good," and they permitted no clear identification of LaRose or his vehicle.  ECF 18-16 at 8.  Even considering LaRose's proposed timeline for his whereabouts, however, police still confirmed that "a lot of [LaRose's] time was unaccounted for" on the day of Jill's murder.  *Id.*

Second, LaRose contends that the State failed to investigate alleged third-party DNA from Jill's car and the rope.  But his allegations at their strongest merely suggest the remote possibility of an unidentified additional attacker.  They would not prevent a jury from finding LaRose guilty.  LaRose's DNA was on the rope used to strangle Jill, and her blood was on his shoe.  To explain the DNA evidence on the rope, LaRose states that he and Jill had been having sexual relations in a storage unit secured by the rope, so any DNA evidence could be traced there.  But LaRose has provided no support for his implausible claim.  At best, it conjures an alternative theory of events that in no way undermines the other compelling evidence.  A "reasonable juror," considering "all of the evidence," could accept or reject

---

[5] LaRose also disputes factual questions such as the frequency he saw his children before the murder and whether the State mischaracterized certain of his views.  Those questions do not appear relevant to the murder inquiry and would not preclude a reasonable jury from finding him guilty.

7

LaRose's theory and nevertheless convict him in light of the overwhelming evidence against him. *Schlup*, 513 U.S. at 329. The Court has no reason to credit his claim of actual innocence.

## II.

Because a habeas petitioner must independently satisfy the statutory elements plus the equitable requirements, a reviewing court can deny a petition for failing to satisfy either. *Hurst*, 2025 WL 3718303, at *4. Focusing on the equitable requirements for habeas relief—instead of the statutory requirements—"greatly enhances the ability of federal courts to resolve habeas petitions quickly." *Id.* at *6.

That is a good thing. The "exploding caseload of habeas petitions from state prisoners," *Davenport*, 596 U.S. at 131, harms the rule of law. "A large new haystack of frivolous habeas petitions" makes it "that much harder for courts to identify the meritorious needle." *Edwards v. Vannoy*, 593 U.S. 255, 287–88 (2021) (Gorsuch, J., concurring) (citation omitted); *Allen*, 344 U.S. at 537 (Jackson, J., concurring) ("He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search."). Another "serious evil" from the "proliferation" of meritless habeas petitions is their "drain upon the resources of the community—judges, prosecutors, and attorneys . . . ." Judge Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 148 (1970). "And in noncapital cases, the remote prospect of a guilty offender running free because of a technicality uncovered during habeas proceedings 'offers false hope to defendants.'" *Hurst*, 2025 WL 3718303, at *6 (quoting *Edwards*, 593 U.S. at 272). It also robs victims of the "real finality" needed to "move forward." *Shinn*, 596 U.S. at 376.

LaRose's motion is a prime example of this problem. Challenging his conviction for murder that occurred almost 20 years ago, LaRose raises nearly 100 claims in a motion stretching nearly 450 pages. He has pitched a haystack of arguments. The Court,

fortunately, need not search for the needle. "[O]nly in extraordinarily rare circumstances may a court exercise equitable discretion to grant relief." *Hurst*, 2025 WL 3718303, at *6. LaRose is factually guilty, and his efforts to dodge his sentence must end there. As a matter of equity, LaRose's petition fails. He cannot seek equity with unclean hands.

## Conclusion

The Court will not lightly act as an appellate tribunal over Missouri's "entire state judicial system," which already reviewed LaRose's hundreds of claims and saw "nothing amiss." *Edwards*, 593 U.S. at 287 (Gorsuch, J., concurring). **IT IS HEREBY ORDERED** that LaRose's petition for writ of habeas corpus, ECF 1, is **DENIED**. A separate order of dismissal shall accompany this memorandum and order.

Dated this 27th day of February, 2026

_____
JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE

9